Good morning, Your Honors, and may it please the Court and Counsel, my name is Surya Saxena representing the Plaintiff and Appellant, UnitedHealthCareServices, Incorporated. United has plausibly alleged in its first admitted complaint that AmerisourceBergen intentionally defrauded United and other third-party payers by engaging in an overfill harvesting scheme over the course of several years. That scheme was designed to increase its revenue illegally by distributing visibly contaminated, unsterile, misbranded injectable cancer drugs, drugs that could not be lawfully administered to patients in the United States under the Food, Drug, and Cosmetic Act. They distributed the drugs using fabricated prescriptions. They made up patient names. They distributed those drugs through a fraudulently licensed pharmacy that was only licensed by to several regulators in several states. We've pleaded in our first admitted complaint that AmerisourceBergen's executives themselves and internal communications knew that the design of the scheme was to defraud insurers. For example, in paragraph 238 of our first admitted complaint, we've pleaded that an internal finance executive wrote in an email that as soon as the third party is billed, it is billed fraudulently. Okay. Counsel, it seems the fighting issue in this case is the timeliness determination made by the district court. Would you address directly and right away? Yes, Your Honor. I'm happy to move to the statute of limitations issues. First, Your Honor, as background, the first amended complaint was the result of a rule came after a Rule 59 motion that we, that United filed after the district court dismissed our initial unamended complaint. As part of its order granting our Rule 59 motion and our amendment, the district court expressly held that the first amended complaint, so the same complaint that it later dismissed, quote, plausibly creates a fact issue on timeliness. That's at the court's order, the district court's order record document 76 at page 8. The district court in then later dismissing the exact same first amended complaint did not address its initial finding that the same complaint created a fact issue on timeliness. It went on to hold that United was time barred because of public statements. So first, Your Honors, on the statutory fraud claims that we've alleged, the standard is whether we've alleged fraudulent concealment, and Amerisource Bergen spends a significant amount of time in its brief talking about fraudulent concealment. But United has plausibly pleaded fraudulent concealment. This is at pages, paragraphs, excuse me, 297 through 348 of the first amended complaint. We've pleaded, for example, that for several months beginning in 2012, Amerisource Bergen intentionally killed a newspaper story by calling the editor of a newspaper where a reporter was asking precisely the questions that would have caused the disclosure of this scheme. The reporter was asking Amerisource Bergen executives whether they had fraudulently licensed a pharmacy, whether they were distributing pre-filled syringes in a manner that was not connected to specific patients, which is exactly what they were doing. What was the date of the reporter's inquiries? If you said it, I missed it. The date of the reporter's inquiries was in 2012, Your Honor. Yes. And we've pleaded that Amerisource Bergen intentionally killed that story because they did not want the scheme to come to light. We've also pleaded to the editor of a newspaper where a reporter was asking precisely  We've also pleaded to the editor of a newspaper where a reporter was asking precisely the questions that would have caused the disclosure of this scheme. But you've got, like, the statement made to shareholders. I'm trying to find all the different things here. There are several statements that were made, and I think there was a Wall Street Journal story at some point that would have notified UnitedHealthcare about the fraud. That's correct, Your Honor. And one of the latest fraudulent acts of fraudulent concealment is actually the document that Amerisource Bergen is primarily relying on to suggest that they told the world about the scheme. And that's a November 6th, November 2016 SEC disclosure. What's notable, this is at their supplemental appendix, pages 96 and 97. I think what's very notable about that, two things. One is that's only two months before the operative date. So the date where our statute of limitations would have ended, would have, or sorry, would have begun is January of 2017, okay? So only two months before that, in an SEC filing, Amerisource Bergen affirmatively concealed precisely the facts that would have allowed Medicare and other third-party payers to identify the scheme. They concealed the name of the pharmacy at issue. They concealed the fact that these prefilled syringes were being distributed to providers. They stated in their SEC disclosure that these PFS were only sold to, via intercompany transactions to another subsidiary. They did not say that they were being sold to providers. They did not say that there was false prescriptions. They did not say that there were false patient names that were being used. They did not say that the investigation involved lying to regulators about the fact that these, that the pharmacy, the Dolphin facility, was filling prescriptions without actual patients to prescribe the drugs to. Those announcements, though, refer to an Alabama pharmacy, which would have at least directed United's attention to this pharmacy, I would think. Well, Your Honor, in the healthcare industry, payers have only certain criteria that they can use to look up claims. We can look up claims using the member name, and the member names obviously weren't disclosed. We certainly could have looked up specialty pharmacy claims, so claims that are billed directly to the payer by the pharmacy, if we had the pharmacy's name. There are a number of different specialty pharmacies and retail pharmacies throughout the United States. By merely calling out one state, that was not nearly close enough to allow anyone to investigate what claims were submitted. There's an added layer of complexity here, which Amerisource Bergen really capitalized on through this scheme, and you can see this in our complaint where they were lying to providers about their responsibilities to third-party payers and whether this constituted Medicare fraud. The additional layer is that with these injectable drugs, the drugs need to be prescribed to a patient if they're going to be distributed by a pharmacy. They then are purchased by the provider, and the provider is supposed to list the same patient that was prescribed the drug by the specialty pharmacy in their claim to the insurer. What happened here is that Amerisource Bergen told providers, even when providers were raising concerns about the legality of this scheme, that it didn't matter if they changed the name and that they should disregard the false name that was on the packaging. So in that scenario, Your Honor, to your point, there's no way for a third-party payer to identify these claims when the name of the patient has been switched, the drug that's being billed using a J-code or a HCPCS code is not actually the drug that has been distributed, and where the pharmacy is only calling itself a pharmacy so that it can get around FDA regulations, which would have otherwise required this pharmacy to be registered as a repackager and would have required FDA audits of its premises and compliance with good manufacturing practices, which Amerisource Bergen knew from the very beginning and its subsidiaries knew from the very beginning that they could never comply with. Because again, the whole purpose of the scheme was for Amerisource Bergen to buy a certain set of vials that were FDA-approved, they were in FDA-approved packaging with FDA package inserts, and to multiply the number of reimbursements that they could get. So to effectively get paid for more vials than they ever purchased. I get that, but, you know, the district court probably relied on the wrong elements, but I have a problem seeing the damages that UnitedHealthcare has, and I'll tell you why. Because the fact of the matter is you would have paid for it from somewhere for these patients. The patients were certainly harmed if they got worse, you know, worse cancer or they had some other deleterious effect, but I can't see how UnitedHealthcare is damaged in some sort of unique way unless UHC so cares for its patients that they would be upset if somebody got the wrong medication. But that's like an emotional injury, that's not a financial injury. Yes, Your Honor. So on damages, there's a very clear measure of damages under Minnesota State law for fraud claims, and the measure of damages is the difference between what we were told we were going to receive and what we actually received. We have plausibly alleged, and it makes common sense, that a third-party payer does not get value for money when it is being sold a drug that cannot lawfully be administered to a patient. If it doesn't go to you. I think that applies when it goes to the particular person, right? I don't know that it applies to a third-party who happens to be paying for the item for someone else. It does, Your Honor, and so I would commend the Liberty Mutual versus acute care case. This is a Judge Nelson decision where she goes through in great detail this precise issue. Also, the Kinetic case talks about the third-party aspect of what you're describing. And effectively, in the United States healthcare system, the payer is in the room with the patient. The patient cannot obtain these expensive injectable cancer drugs unless it's relying on the both express and implied representations of the drug manufacturer and all of the parts of the healthcare supply chain. And it's undisputed that no patient would want visibly adulterated, contaminated drugs injected into them. No one would have accepted it. We've pleaded in the complaint the providers wouldn't have accepted it. We've further pleaded that United wouldn't have reimbursed for these. And every case that's been cited by either party that pertains to either drug, defective drugs, or sorry, contaminated drugs or FDA-unapproved drugs or defective devices has come to the same conclusion that the third-party payer, at least at the pleadings phase, can allege damages. And it's really no different from the illustrations that are in the restatements of torts, restatement of torts on this. The question is not in a but-for world, would we have paid to another provider the same amount? The question in fraud cases just looks at the facts in the case at hand. It doesn't imagine what may have happened but for the purchases. It only looks at whether we were made false representations, whether we made purchases, and whether we obtained something that isn't valuable. And we've plausibly pleaded that there is a delta between what we purchased and what we got. And it makes common sense that these drugs, which literally cannot be legally used for any purpose in the United States, that they don't have value. I would also submit that at least there's a fact question that shouldn't be resolved on a motion to dismiss. Does that leave room, real quickly, does that leave room for the patients to sue? Because I'm trying to think about how this wouldn't be a double recovery. If UHC recovers and the patients sue and say, well, I didn't get my money's worth either because I got a copay and now I'm, you know, now I've got worse cancer and all that, I mean, does that leave room for both parties to sue? Well, that's not for me to say conclusively, Your Honor, but yes, the patient is out the copay and coinsurance unless they've met their deductibles. So they would have an out-of-pocket loss. The other, it also raises the point that there's other forms of damages that Minnesota because we're trying to enforce, we're trying to prevent and deter parties from engaging in fraud. And so, yes, could the patients have both pecuniary loss? Yes, they could. Could they have consequential damages? They could. And could they also have personal injury damages? They could. Although that's not part of this case. And unless there's any other questions for right now, I will reserve the rest of my time for rebuttal. Thank you, Mr. McSaman.  Mr. Okawa? May it please the Court, I'd like to start right where Judge Smith did on the question of timeliness. And I do think that part of what's going on in the discussion as I read the briefs is there's actually a debate about what the standard is with respect to fraudulent concealment So let me talk about that and why I think that cuts our way. And I would direct the Court to Wilde v. Rarick. And Wilde v. Rarick is, you know, lays out without applying them what the Minnesota Supreme Court says in the 70s are the clearly established principles around fraudulent concealment. And it says something very important. It says it's not necessary to begin the clock, that the plaintiff know the details. Not necessary to know the details. I understand there are some discovery rule cases that push the other way, and I can talk about discovery rule separately. But for fraudulent concealment, it's not necessary for the plaintiff to know the details, only essentially that there is a problem. And so, Judge Strass, when you have a disclosure, and I do think that's important, there's a 2016 disclosure, it's pretty detailed. And I think, you know, from a disclosure lawyer perspective, pretty hair-raising in terms of, look, the U.S. Attorney in Brooklyn is bound and determined to bring charges, both criminal and civil, arising out of this facility in Dothan, Alabama, relating to oncology products. It identifies prefilled syringes as the kind of products at issue. Oncology products is the kind of products at issue. I think that puts out into the world and makes, you know, takes away any kind of concealment that could have been suggested by 2010, 2012 era facts, like those that my colleagues suggested are critical. Suppose, though, that you do have fraudulent concealment happening at the same time. I understand there were some disclosures, but suppose, you know, UHC looked into it and they called the pharmacy, or they called the Merisource and said, are you doing all these things? And they say, absolutely not. We're not doing it. We're going to send you a bunch of documents and all of that. I mean, that sort of suggests that maybe it's reasonable not to immediately run to court and sue. So I think that's right. I think that's one of the Blue Cross cases that they point to where they say, well, the court says, yeah, there were disclosures, there was evidence that, you know, the government was looking hard at a problem. But when you talk to the company, they said, look, don't worry about that. That's resolved. And you don't have that here. Well, you have Merisource Bergen saying this isn't resolved. We're looking to resolve it. But, you know, you should understand what the resolution is likely to look like. And no surprise, once a company is willing to put that in its SEC statements, that's exactly how it's resolved. So I think it's very different from a case that you could have where the defendant then tries to moderate or cover over what's disclosed. You just don't have that here. And so I think with that, the tolling period began. No later than the fall 2016, I don't think there's any disagreement between the parties about the math, that if it started to run at the time of the 2016 disclosure, it had run before the first complaint in this case was filed. You know, let me turn to the damages point. You know, my friend says, well, this is like all the other cases where the third party appears. I don't think there's any other case that has the kind of allegation that you have in paragraph 12 of their complaint where they say that they're completely equivalent products available for the same price, including from Merisource Bergen, that we are reimbursable under our plans. So I mean, I think that just pleads them out on this damages point because they're just saying in a buck four world, we would have ended up in the same place. They said the measure of damages is established. Judge Strauss, I agree with you. If it's the purchaser that actually has, you know, actually has, and some of this court's cases are pretty clear on this, actually has the defective product, not just a product that came out of a defective process, you know, that would be distinct and kind. But here you have the economic relationship that UHS has is one of reimbursing. And so their relationship is, well, in the buck four world, we would have paid the same amount for the same good. I do think that's completely different from every other case. You also mentioned the problem of double recovery. Mr. Saxon says, yeah, no problem. Well, you know, coming now to proximate cause and leaving damages behind, that's a classic problem in proximate cause. Well, you have a more proximate injured party per their allegations. And what the courts generally say is, well, if you have an injury that's purely incidental to the loss that was suffered by another party, that's the proximately caused, the proximately injured party. And the party that is, that's next down the line, in general, is too far removed. The steam fitters case that Judge Becker had in the Third Circuit cited in the reply is a good example of that. Bridge versus Phoenix Bond, also cited in the reply, comes to this point. So I think you have a really classic proximate cause problem that also knocks out their statutory fraud claim. And while I know there's group health, as you don't have to be a direct purchaser, and I think that's true, it's established in Minnesota case law, what you have there is an insurer that's not just saying, I'm suffering the same injury, got the product that's not worth as much, but has a very distinct injury. It says, I paid for the treatment, but the smokers may have paid too much, in some sense, for a good that they thought wouldn't be as injurious as it is. But the insurer is paying for the injuries that are completely different, and you wouldn't have any double recovery problem. Kinetic, Neurontin, other cases that they cite, and they say, well, third-party payers recover, are all in that vein. And there's some sort of distinctive injury that leaves the insurer to pay more. Although, you could have a situation where you could almost apportion the damages. You know, if it's a 90-10 scheme, let's say, for the insurer pays 90, the patient pays 10, you could say, well, you get the 10 percent of whatever the recovery is, and the insurer gets 90 percent, and they've both been defrauded, at least in the fraud context. So I think you could, but what the proximate cause cases say is we generally try to avoid those problems of allocation by saying the party first in line gets to sue. You know, if they have rights contractually against the provider or the patient to recover some portion of their injury, you have, of course, have a whole other slate of cases that are like that. You recovered, and I have a right to recover what you recovered. But that's distinct from the court question of whether UHS, as the third-party payer for this kind of injury, is proximately located. What's the best Minnesota case? Proximate cause is often in the eyes of the State Supreme Court, a particular State Supreme Court. So what's the best case? Yeah. So I would say you asked for a Minnesota case. Yes. Let me first give you a case from this court, Schaaf, where They're applying Minnesota law. Applying Minnesota law. Applying the Minnesota statutes that are issued here and says we don't see a causal nexus, as they talk about in group health, is a proximate cause issue. We don't see a difference. And so then applies that at the pleading stage to dismiss the claims at issue. Is that case relied on group health? It does. It comes after group health. There's a whole dispute. The Minnesota Attorney General was in here, the consumers, the defendant, all talking about how to understand group health. And it clearly positions and understands group health as a core proximate cause case that leaves aside traditional but-for first-party reliance requirements, but then when it turns to causation says this is proximate cause. I think that addresses most of the claims. Unjust in Richmond, I'm not sure I need to deal with. It's not addressed in their reply. I haven't heard about it this morning. But I think Judge Frank was clearly right to say there has to be a relationship between the parties for unjust enrichment to lie. There is none here. That's pleaded by them. Look at paragraph 380 of their complaint, for example. In an uncommon law fraud, we address in our brief. There's a Rule 9b problem right up front. They never say what exact statement they received. That's in their own claim submission forms that they receive if they had pleaded. Here's exactly what we got. They don't have a 9b problem. They do. And I think that, in addition to the damages issues and the timeliness issues, addresses those claims. Unless there are questions from the panel, I'm happy to rest on my briefs on the rest of the points. I don't see any. Thank you. Thank you, Mr. Renner. Okowa? Thank you, Your Honors. I have limited time available. I will just make three points, if I could. One, to Your Honors, to Judge Benton's question. Group health was actually a much more attenuated causal chain than what we were dealing with here because in group health, the insurers were suing to recover their consequential damages for injuries that people had suffered as a result of smoking, whereas here, we are trying to recover exactly the products that we paid for and only the amount that we paid. We're not trying to recover co-insurance or co-pays. So the causal chain here is actually much closer than what was in group health. On the issue of damages, I just wanted to highlight that Amerisource Bergen has not cited a single case in which a court has applied this but-for world. That is an antitrust concept of damages. It is not a fraud concept of damages. And at the pleading stage, all that we need to do to plausibly plead damages is to state common-sense facts that we did not get what we were told we were getting. And I think we've done more than that by pleading that these drugs could not be lawfully administered to anyone in the United States and that we paid good money for those based on false representations about the name of the drug, about false express representations about the patient's name, implied representations about the drugs being sterile and not visibly contaminated. On the issue of the statute of limitations where we started the morning, Your Honor, again, Amerisource Bergen has not cited a single case which at the pleading stage has dismissed a third party's claim based on public pronouncements like SEC filings. The only times that's ever happened is in cases where an investor is, you know, part of the company. They've invested in the company. They receive disclosures. They have been, in cases, found to be on notice of those things. The case that they actually rely on is a Colorado case. It's Grinberg, I believe. That was a summary judgment case. And I think it's very important that the Court allowed discovery there into all of the public pronouncements, didn't determine that at the pleading stage. Thank you, Your Honors.